STATE OF MAINE
PENOBSCOT, SS.

DISTRICT COURT
BANGOR
CIVIL ACTION
Docket No. CV-03-17
JLH - PEN-10 2.2002

FILED & ENTERED
SUPERIOR COURT

OCT 10 2006

PENOBSCOT COUNTY

Oak Ridge Builders, Inc.
    Plaintiff/Counterclaim Defendant

v.

Decision and Judgment

DONALD L. GARBRECHT
LAW LIBRARY

OCT 16 2006

Todd M. Howland et al.,
    Defendants/Counterclaim Plaintiffs

Hearing was held on the complaint and counterclaim. On each hearing date, the parties were present with counsel. Following the hearing, the parties filed written argument, which the court has considered in conjunction with the record evidence. The parties' claims arise out of a home construction contract, under which Todd M. Howland and Julie M. Howland purchased an unimproved houselot from Oak Ridge Builders, Inc. and then entered into a contract with Oak Ridge for the construction of their house. During the course of the construction project, the parties' relationship became entangled in sharp disagreement regarding their rights and obligations, and Oak Ridge did not complete construction of the house. This lawsuit followed.

In early 1992, the Howlands purchased the prospective houselot from Oak Ridge. The gross purchase price for the lot was $40,000. However, the parties agreed that if the Howlands engaged Oak Ridge to build the house, they would receive a credit of $5,000. In late January 2002, the parties entered into a written home construction contract, which consisted of the principal instrument and a number of other referenced documents, such as several house designs, a list of features that would be included in the houseplan, and a schedule for disbursements that would be paid to Oak Ridge as the construction progressed. *See* plaintiff's exhibits 2-4, 6, 8, 67; defendants' exhibit 2. Oak Ridge drafted the contract instrument. The total price stated in the contract was $174,250,

1

which included the price for the land. The court concludes that the contract was not integrated. It does not purport to constitute an integrated agreement. Further, as is demonstrated by many of the disputes generated by the evidence, its terms, when viewed within the four-corners of the instrument, were not unambiguous and sufficiently exhaustive to be seen as the definitive expression of the parties' agreement.

One of the ambiguities affecting the contract is a lack of internal clarity about whether the contract price does or does not include the $5,000 credit to which the Howlands were entitled because they chose Oak Ridge as the contractor. The contract refers to the price as "[t]he total contract price, which includes the real estate lot, equipment, materials and labor. . . ." The price of the real estate was subject to a $5,000 adjustment, and the time when the Howlands would receive that credit is not made specific. Although Oak Ridge's principal, Frank Pawlendzio, testified that he took that credit into account when he calculated the "total contract price" of $174,250, the better objective evidence is that as of the time Oak Ridge stopped working on the construction project in September 2002, it still had not given the Howlands that credit against the amount they owed. That evidence is found in a note that Pawlendzio wrote on a copy of the disbursement schedule after work had stopped, where he indicated that of the payments that the Howlands had made to Oak Ridge, $40,000 was attributable to the land purchase. *See* plaintiff's exhibit 35. If, as Pawlendzio contends, the Howlands already had received that credit, then the figure that Pawlendzio wrote on that document would have been $35,000.

Oak Ridge and the Howlands also became parties to a three-way contract with Bangor Savings Bank, which provided the construction money for the project. *See* plaintiff's exhibit 7. As part of that contractual agreement, Oak Ridge agreed to keep the property and structures free of any mechanic's liens or claims.

The construction work began in April, when earthwork was performed and the foundation poured.[1] By mid-July, Oak Ridge requested the first disbursement that would be triggered by construction progress. It sought and, on July 24, received payment of $41,825. This payment covered all items associated with the first draw under the

---

[1] Oak Ridge itself actually did not perform any of the construction work. Rather, its role was to provide that work entirely through subcontractors.

disbursement schedule, as well as some – but not all – items that would have been the basis for the second draw amount. Under the arrangement among Oak Ridge, the Howlands and the bank, the bank was authorized to disburse money to Oak Ridge only with the approval and consent of the Howlands.[2]

During the month of August, disagreements between Oak Ridge and the Howlands, which had started to appear in July, escalated. One of the problems that arose related to the roof trusses that Oak Ridge installed. Oak Ridge placed the trusses 24 inches on center (OC). The Howlands complained that they should be placed closer together (16 inches OC) to provide proper support for loads such as snow. This, however, was not part of the contract, and the evidence establishes that with adequately sturdy roof sheathing (namely, 5/8" plywood sheathing, instead of ½" sheathing that would be used if the trusses were placed closer together), Oak Ridge's installation of the trusses was sufficient. *See* plaintiff's exhibit 26. Nonetheless, the parties' disagreement about the roof system was symptomatic of a relationship that was becoming more difficult.

By letter dated August 26, the Howlands presented Pawlendzio with an "action plan," under which they wanted Oak Ridge to complete certain aspects of the house construction, even though that work was out of the sequence set out in the disbursement schedule, because they were concerned about the change in seasons. *See* plaintiff's exhibit 21. In that letter, the Howlands wrote that they would not authorize the bank to pay Oak Ridge the third draw under the disbursement schedule if Oak Ridge did not finish the items of work they specified in the letter, "even if it means waiting until spring when weather conditions permit optimum conditions for seeding the lawn," which was one of the jobs the Howlands listed in their letter. (Oak Ridge had sought and been paid

---

[2] It does not appear that the express terms of the construction loan agreement or the home construction contract required the Howlands to approve any disbursement made by the bank to Oak Ridge. However, the parties engaged in a practice under which the bank would not make such payments in the absence of the Howlands' consent. In fact, the relationship between Oak Ridge and the Howlands collapsed in September when, at least at one point, the Howlands advised Oak Ridge that they would not authorize the bank to pay Oak Ridge any money, despite the pendency of Oak Ridge's payment request, until it satisfied certain demands. The loan officer testified that the bank was otherwise prepared to release funds to Oak Ridge.

only one draw. However, based on the groups of tasks listed in the disbursement schedule, Oak Ridge's second progress schedule would encompass some of the work that would constitute the predicate for the third draw as identified in that schedule.) Promptly after receiving the letter, Pawlendzio wrote back to the Howlands, advising that Oak Ridge would try to accommodate their directions but also pointed out that the next disbursement due to it was not conditioned on completing work that would be the basis for a subsequent draw. *See* plaintiff's exhibit 22.

In fact, on or just prior to September 7, Oak Ridge made a written request for payment of $28,125. Although the request itself it not included in the trial record, the basis for the amount of that request is set out in a document that Pawlendzio created later in the month. *See* plaintiff's exhibit 35. Of the requested amount, $15,225 consisted of payment from the remaining items of work in the second group on the disbursement schedule. (Oak Ridge already had been paid for the other items in that second group, when the bank made the first progress payment in July.) The balance of the requested payment was for work it had performed and, it asserted, had completed on three of the six items of work in the third group on the disbursement schedule. The Howlands gave Pawlendzio a written response to Oak Ridge's request for payment. *See* plaintiff's exhibit 27. In that response, the Howlands listed a number of items underlying the payment request that they believed Oak Ridge had not completed. They also enumerated several items from their "action plan" that they wanted completed before they would authorize payment of the money Oak Ridge had sought. Finally, they identified a number of credits to which they felt entitled from Oak Ridge and which they contended reduced the draw that Oak Ridge should receive. In the end, the Howlands indicated that Oak Ridge was entitled to payment of $22,525, although as is noted above, they also withheld consent to any payment until Oak Ridge performed the additional work they listed in the document.

In fact, a number of the items that the Howlands claimed had not been completed were performed near the time they wrote their letter and delivered it to Pawlendzio. Of the items that the Howlands claimed were part of the work for which Oak Ridge sought payment, the only outstanding ones of significance were that the garage doors had not been installed and painted, and that the window grilles and the trim for a couple of

4

windows had not been delivered to the jobsite. However, the garage doors were to be pre-painted, and the Howlands had not selected a color, and Oak Ridge's practice was to withhold delivery of window grilles to avoid damage to or loss of them at the house while it was still under construction. With respect to additional items of work that the Howlands had included in their "action plan," Pawlendzio advised them that he would try to complete that work as an accommodation to them. At least one of those items, however, namely, seeding the leach field, had to wait until the Howlands made arrangements for the delivery of additional topsoil. Pawlendzio provided the Howlands and the bank with a written point-by-point response to their written denial of Oak Ridge's request for payment. *See* plaintiff's exhibits 28 and 29.

Within a few days subsequent to September 11, Pawlendzio concluded that the Howlands were not going to authorize the payment that he felt was due to Oak Ridge. He therefore stopped construction activity. Although Pawlendzio testified that this occurred close to September 11, the record reveals that on September 11 and 12, Pawlendzio left several messages for the Howlands about ongoing construction issues that needed their attention, such as the selection of the garage doors, the topsoil and other matters. Further, in a memorandum dated September 13, the Howlands memorialized a revised set of calculations in which they indicated the amount they felt Oak Ridge was entitled to receive for the still outstanding disbursement request. The new figure they reached was roughly $10,400. Perhaps in response to this, but in any event at around that time, Oak Ridge ceased work on the house.

Through some means not directly revealed in the record, the Howlands learned of this development. Thus, also on September 13, Julie Howland left a verbal message when she tried to reach Pawlendzio by phone. Based on Pawlendzio's testimony, Howland left the message close in time to when Oak Ridge stopped its construction work. Among other things, Howland told him that she knew he had stopped working on the house and reminded him that contractually, they were required to mediate disputes. (Such a provision was included in the home construction contract that the parties executed.) Howland also said, ". . .we need to try to resolve our problems and get through this and, umm, you know, go from there. We have advised Jane [the bank's loan officer] to pay you what you are owed, umm but not for what's not done. So everything

5

that you have done will be paid for up to this point, so there shouldn't be a problem. . . ." *See* plaintiff's exhibit 32A. Despite this invitation, Oak Ridge did not resume construction work on the Howland house. On September 18, Oak Ridge terminated electrical power to the housesite. Then nearly a week later, Oak Ridge amended its disbursement request to add an additional $1,000 for painting work that evidently had been done after it had submitted its payment request earlier that month.[3] The parties proceeded to mediation in October, but that effort bore no fruit.

Oak Ridge received its last payment for construction work in December. At that time, the Howlands authorized the bank to release $3,639 to the contractor. With the Howlands' approval, the bank also made direct payments to several of Oak Ridge's subcontractors. These consisted payments to SKR for siding ($6,199), to Currier for earthwork and septic ($4,700), and to Foley for sheetrock work ($1,506). Those contractors had expressed an intention to impose liens on the property for the amounts owed to them, and the Howlands arranged for direct payments by the bank to avoid those encumbrances. In fact, the Howlands' earlier payments to Oak Ridge should have covered the amount owed to SKR. The basic contract price included an amount attributable to the cost of siding, and then in late August, the Howlands paid Oak Ridge directly an additional amount that resulted from an upgrade chosen by the Howlands during the construction process. *See* plaintiff's exhibit 25A. However, Oak Ridge did not pay those moneys over to SKR, and, to avoid a lien, the Howlands were in a position where they had to pay SKR directly. Thus, the Howlands ended up paying twice for the cost of siding.

---

[3] There is some disagreement between the testimony of Pawlendzio and Julie Howland regarding the specific dates of some of the events noted in the text. For example, Pawlendzio's testimony may be construed to suggest that he curtailed power to the worksite as early as September 11. Howland, however, testified that this event did not occur until a week later. This and other events in temporal proximity to the cessation of construction may have significance because of the interrelationship of those events with Julie Howland's message to Pawlendzio that they would authorize the bank to pay Oak Ridge for work already performed. The court places greater reliance on Howland's memory of specific dates, largely because she demonstrated greater certainty about those dates and because Pawlendzio's testimony made clear that some of the dates he discussed were approximations. The court also finds guidance in the documentary evidence, much of which contains dates.

Oak Ridge itself filed a lien against the Howlands' property in October 2002. When it received payment from the bank in December, it filed a partial waiver of its lien in recognition of that payment of a portion of the amount it claimed remained due.[4] However, when Oak Ridge commenced this action, one of its claims sought to enforce the remaining aspect of the lien. The court granted the Howlands' motion to dismiss that count because the lien claim was not filed in court in a timely way. When asked at trial about the provision in the construction loan agreement among Oak Ridge, the Howlands and the bank under which Oak Ridge was obligated to keep the property free of any liens, Pawlendzio testified that he did not read the contract and was not aware of that provision.

The central claims pursued by the parties are based on allegations of breach of contract. Oak Ridge contends that it was entitled to stop construction work altogether because the Howlands breached the contracts when they refused to authorize the bank to pay Oak Ridge the amount it claims should have been paid. The Howlands, on the other hand, contend that they were justified in raising the issues they did and that their actions did not provide Oak Ridge with a legal basis to terminate its construction work.

"When one party breaches a contract, the nonbreaching party may, depending on the circumstances, either treat the breach as partial or total. A total breach of contract is a non-performance of duty that is so material and important as to justify the injured party in regarding the whole transaction as at an end . . . If [the] breach is not sufficiently material and important for this, the breach is called a partial breach." *Down East Energy Corp. v. RMR, Inc.*, 1997 ME 148, ¶ 10, 697 A.2d 417, 421 (citation and internal punctuation omitted). Viewed obversely, this means that a party's obligation to perform its remaining duties under a contract is conditioned on the absence of any "uncured material failures" by the other party to the contract. *See* RESTATEMENT (SECOND) OF THE LAW OF CONTRACTS (Restatement), § 237 (1981). The determination of whether a breach is material is a question of fact. *Jenkins, Inc. v. Walsh Bros., Inc.*, 2001 ME 98, ¶ 13, 776 A.2d 1229, 1234. Factors relevant to that determination include consideration of the extent to which the breach would deprive the non-breaching party of a benefit due under

---

[4] The Howlands argue that the partial lien waiver also constitutes a waiver of the underlying claim against them. The waiver, however, is limited to any relief that Oak Ridge might have pursued based on the lien itself and did not extinguish any claims against the Howlands themselves, which Oak Ridge has continued to pursue.

7

the contract; the extent of harm facing the breaching party if the contract is forfeited; the likelihood that the breaching party will cure the failure to perform; and a comparison of the breaching conduct to standards of good faith and fair dealing. Restatement at § 241 (cited with approval in *Associated Builders, Inc. v. Coggins*, 1999 ME 12, ¶ 6, n.1, 722 A.2d 1278, 1280). The notion of materiality in this context is "necessarily imprecise and flexible." Restatement at § 241, cmt. 1.

The court applies these principles to examine Oak Ridge's claim that the Howlands committed a material breach of their contractual duties. Oak Ridge stopped its construction work because the Howlands advised it that they would not approve payment of any portion of the September draw request until it completed certain tasks and then, if they did approve payment, they would approve only a portion of that request. The resulting question is whether by imposing these conditions and limitations, the Howlands committed a material breach that justified Oak Ridge's decision not to perform any of its remaining duties created by the contract.

Oak Ridge was clearly entitled to payment of some amount of money when it submitted its initial draw request of $28,125 in early September, which it increased to $29,125 later in the month. As is noted above, Oak Ridge had substantially completed the items in the second group of tasks outlined in the disbursement schedule that were not already included in the previous draw. Additionally, Oak Ridge had substantially completed three of the six items in the next group of tasks listed in the disbursement schedule. The only significant task included in these items that Oak Ridge had not completed was the installation of the garage doors. The delay, however, was caused because the Howlands had not yet selected the doors. The best evidence suggests that the cost for the work associated with the doors was $1,500. *See* plaintiff's exhibit 33. Oak Ridge also had not delivered a glass storm door for which the Howland had previously paid $350. *Id.* The Howlands make a passing argument here that Oak Ridge was not entitled to payment for *any* of the items in the third group of tasks until it had completed *all* of the tasks in that group. This argument enjoys support from the terms of the written home construction contract. However, when Oak Ridge had received the first progress

8

payment,[5] the Howlands had approved a single payment for all of the items in the first group of tasks and for some of the items in the second group. Thus, the nature of Oak Ridge's second construction phase disbursement request was identical to the one that the Howlands had approved in late July. Thus, the parties' course of dealings undermines the Howlands' argument on this point.

This evidence indicates that Oak Ridge's gross entitlement was for a payment of $26,275, which is the requested amount of $28,125, less the cost of the garage doors and the storm door. That amount increased by $1,000 in late September because of some painting work on the house. However, the amount due to Oak Ridge was reduced by several other adjustments. First, Oak Ridge had agreed to eliminate a $3,500 well allowance from the contract price. This was part of the water and sewer work identified in the disbursement schedule for which Oak Ridge sought payment in its September request. Additionally, there remained the matter of the $5,000 credit noted earlier in this order. For the reasons explained there, Oak Ridge still had not given the Howlands credit of $5,000 against the purchase price for the housesite. As described by Pawlendzio, the price reduction agreement entitled the Howlands to that credit if they had Oak Ridge construct the house within one year of purchasing the land. The evidence does not reveal such details about whether that construction needed to be completed within that period of time or when, during the construction process, the credit would arise. Thus, the record does not show that the Howlands lost their right to the $5,000 offset, and their claim to that credit on September 13, see plaintiff's exhibit 33, is not defeated by the record.

The Howlands also claimed that Oak Ridge's request was subject to a further reduction of $6,199, which they felt they should receive as reimbursement for money they claim they paid to SKR for siding. See plaintiff's exhibit 33. However, the evidence indicates that this money was not paid to SKR until December, as part of the bank's direct payments to several vendors (including SKR) who threatened to file liens on the property. Thus, as of early September, the Howlands were not entitled to any such credit, and the total amount that Oak Ridge was entitled to receive for work already performed was $17,775 (that is, $26,275, less $3,500, less $5,000). (Again, this

---

[5] Prior to the commencement of construction, the Howlands (directly and indirectly through the bank) made several payments to Oak Ridge.

9

increased by $1,000 later in September; the issue here is what the Howlands should have done prior to that amended draw request.)

The Howlands, however, initially refused to allow the bank to pay any money to Oak Ridge in response to its draw request, pending completion of additional work that the Howlands identified. Although Pawlendzio advised the Howlands that he (through Oak Ridge) would try to accommodate those requests, he would not agree to an arrangement that payment for work performed was to be conditioned upon completion of those additional tasks. In imposing these additional conditions to payment of any money, the Howlands went beyond the conditions to payment established in the contract and, in effect, attempted to create and impose new ones. The work that the Howlands now wanted Oak Ridge to perform were mostly included in the final group of tasks outlined in the disbursement schedule. Oak Ridge therefore had no contractual responsibility to work on and complete those aspects of the construction project in order to receive payment for tasks included in previous groups. Thus, by imposing extra-contractual conditions to a payment that Oak Ridge was entitled to receive, the Howlands breached the contract.

Within several days of purporting to impose those extrinsic conditions, Julie Howland telephoned Pawlendzio and advised him that she had authorized the bank to pay Oak Ridge for the work it had performed but would not authorize payments for work that remained outstanding. Although Howland certainly told Pawlendzio (in her recorded message) that she had done so, in fact, as the loan officer testified, the Howlands did not approve or authorize payment of any part of Oak Ridge's disbursement request. The absence of any such authorization is confirmed circumstantially by the very fact that Oak Ridge did not receive that part of the request that the Howlands believed, even at that time, it was conditionally entitled to receive. *See* plaintiff's exhibit 33 (Howlands' computations indicating that with the reductions and credits they claimed at that time, Oak Ridge would be entitled to be paid roughly $10,300). The best explanation for the Howlands' decision not to authorize payment of *any* money to Oak Ridge is that they conditioned payment of any money on performance of tasks that, under the contracts, simply were not conditions to that payment.

10

The court concludes that the Howlands' breach of the contract was a material breach and excused Oak Ridge from further performance under the contracts. The amount of money to which Oak Ridge was actually entitled was significant in the context of this construction project, particularly when, as the Howlands knew, Oak Ridge used that money to pay subcontractors for work they had already performed. Thus, Oak Ridge would not absorb non-payment in a way that might be done by a contractor that actually performed the work.

The circumstances of the Howlands' failure to pay Oak Ridge did not suggest that they would cure that breach in a reasonable time or in a reasonable way. As early as August 26, the Howlands advised Oak Ridge that they would not authorize any part of the third draw as set out in the schedule, until Oak Ridge satisfied their "action plan." The items in the action plan were not contractual conditions to Oak Ridge's entitlement to the payment it requested shortly thereafter. The Howlands reiterated the extra-contractual conditions to payment in their September 8 memorandum. As is noted above, Julie Howland's subsequent verbal assurance to Pawlendzio that she authorized the bank to pay some money to Oak Ridge was not accurate, and there was no reason for Oak Ridge to reasonably expect that the Howlands would authorize payment for work already completed.

These circumstances also raise significant questions about the quality of the Howlands' dealings with Oak Ridge on matters that should not have been the subject of debate.[6] Forfeiture of the Howlands' rights under the contract could be seen to work a hardship on them because as of mid-September 2002, they were left with a partially constructed house and no contractor. However, those effects arose directly from a material breach of their own responsibilities owed to Oak Ridge.

The Howlands' decision not to authorize payment to Oak Ridge, under the circumstances discusses above, was of sufficient materiality and importance that it warranted Oak Ridge's conclusion that the entire transaction had come to an end. Oak

---

[6] As is discussed below, the Howlands were not satisfied with some aspects of the construction work on the house. However, those issues fell well short of a justification for their decision to withhold payment from Oak Ridge in September.

11

Ridge was thus excused from further performance under the contracts. *See John W. Goodwin, Inc. v. Fox*, 1999 ME 33, ¶ 18, 725 A.2d 541, 545.

In assessing damages for breach of contract, the objective is to quantify the injured party's "expectation interest," which means that that party is entitled to compensatory damages that will put it in a financial position equivalent to the position it would have been in if the breaching party had performed. *See Deering Ice Cream Corp. v. Colombo, Inc.*, 598 A.2d 454, 457 (Me. 1991). The damages analysis requires consideration of losses or costs that the non-breaching party would have incurred if it had performed its side of the contract. *Id.* Here, Oak Ridge contends that it is entitled to an award of damages for breach of contract that is based simply on the difference between the contract price and the amounts that the Howlands paid for construction work (including payments made to Oak Ridge and payments that were made in December 2002 directly to Oak Ridge's subcontractors). However, the payments that the Howlands made to Oak Ridge, and the payments they would have made to Oak Ridge if they had not breached the contract, were used (and would have been used) as the source of money with which Oak Ridge then paid its subcontractors. Because the Howlands breached the contract and Oak Ridge stopped the construction work, Oak Ridge was relieved of any obligation it would have had to pay subcontractors for subsequent work, because that work was not done through Oak Ridge. This means that if the parties had continued to perform pursuant to the contract, Oak Ridge's final position would not have been based on the amount of the money that remained due to it under the contract, but rather on the difference between those future payments and the amount it would have paid out to the subcontractors and for other construction-related expenses.

The record contains no evidence of the net amount that Oak Ridge would have realized if the parties had performed fully under the contract. Thus, its expectancy interest cannot form the basis for an award of damages. Rather, the basis for any award of compensatory damages is limited to the amount that Oak Ridge was entitled to receive for work actually performed. That amount outstanding as of September 2002 is established above: $18,775 (which includes the additional $1,000 requested in late September for work already completed). However, in December, the Howlands caused

the bank to make payments totaling $16,085 to Oak Ridge and several subcontractors. Thus, after the December payments, the Howlands owed Oak Ridge $2,690.

The amount of its contract damages, however, then requires consideration of the Howlands' claim that Oak Ridge did not construct aspects of the house in a reasonably workmanlike manner or in a manner required by the contract. Damages arising from any such deficiencies reduce a contractor's recovery against a homeowner's for the latter's breach of contract. *Cf. John W. Goodwin, Inc.*, 1999 ME 33, ¶ 19, 725 A.2d at 545. The Howlands presented the testimony of a home construction estimator, Stacey Goodwin, who identified more than twenty problems that she characterized as either construction defects or failures to meet the contractual specifications for the house.[7] Without the need to address the merits of most of her opinions and conclusions, with the two exceptions noted below, her testimony provides very little insight into the salient issue, which is the amount of damages arising from the problems she described.[8] Evidence associated with her testimony included a detailed, itemized estimate of the cost for additional work that might be performed on the house. *See* defendants' exhibit 4. However, it is evident that the labor and materials described in that document go well beyond remedial work. Rather, the comprehensive nature of that document indicates that it encompasses the work that would be needed to complete construction of the house altogether, rather than simply curing any problems with the work that Oak Ridge actually did. In this way, it is comparable to the billing documents issued to the Howlands by a third-party contractor

---

[7] Although it was clear that her testimony covered both of these categories of alleged problems, her testimony was offered only as evidence of construction problems that amounted to failures to meet the standard of workmanlike quality.

[8] Only several of the problems noted by Goodwin have readily ascertainable estimates for repair. Two of them noted in the text form the basis for relief. Two others are reasonably identifiable. First, Todd Howland did some work to install insulation and blocking. The court is not convinced that the Howlands are entitled to compensation for these small amounts. Second, Goodwin estimated the cost of changing the elevation of the garage floor. This would be chargeable to Oak Ridge only if it was needed to satisfy the contract specifications, and the court cannot conclude that Oak Ridge built the garage other than in the way the contract required. A comparison of the relevant portions of plaintiff's exhibits 6 and defendants' exhibit 7 leaves resolution of this issue uncertain, particularly in light of evidence that there were changes in the elevation of the garage floor and the height of the garage doors to accommodate a transom.

13

that actually completed the construction. *See* defendants' exhibit 10. The court does not find it possible to confidently cull from Goodwin's estimate the cost for the work that would be limited to remediation of any actionable shortcomings that might be assigned to Oak Ridge. Further, the passing references that Goodwin made during her testimony to the costs of purely remedial work, combined with broad and uncertain references to such costs in her narrative report, were too speculative to form the basis for any meaningful quantification of such damages.

The only reliable evidence of remediation costs arising from Oak Ridge's work relates to, first, the costs of correcting problems with the siding and, second, the expense for window screens, grilles and trim that Oak Ridge still has not delivered to the Howlands, even though they paid for that material as part of the first progress payment. The evidence reveals that the Howlands were invited to pick up that material at Oak Ridge's attorney's office but that they declined to accept it because some items were missing and because Oak Ridge insisted that the Howlands pay some amount of money to be able to take it. Under these circumstances, the Howlands did not wrongfully reject the tender. The evidence shows that the value of the window-related items is $1,800. The cost to repair problems with the siding is $700.

When this cost is compared to the Howland's outstanding balance owed to Oak Ridge, the result is that on Oak Ridge's contract-based claims, the Howlands owe Oak Ridge $190.

Oak Ridge has pursued a claim against the Howlands under the late payment statute, 10 M.R.S.A. § 1111 *et seq.* The court concludes that Oak Ridge is not entitled to limited relief under these provisions. Section 1118(2) provides for an assessment of a penalty based on the amount of the unpaid balance when the amount has not been withheld in good faith under section 1118(1). There certainly were issues subject to a good faith dispute among the parties during the time when the Howlands withheld payment from Oak Ridge. The net amount owed by the Howlands takes into account their legitimate claims noted above. Beyond the amounts that they have quantified satisfactorily in the evidence, however, there were additional problems that cannot form the basis for further relief to the Howlands only because of insufficient proof of damages. Nonetheless, such other problems existed, including trusses that did not have proper

14

bracing,[9] a toilet that was not located properly, cracking in walls because Oak Ridge did not adequately support a porch roof during construction, a kitchen door that was not properly framed, and sills that were not adequately secured to the foundation. The court cannot say that the significance of these items fell short of supporting a good faith dispute about the amount of money that Oak Ridge was entitled to receive in early September. Therefore, Oak Ridge has not established that it is entitled to relief under the statute.

The Howlands' cross-claims for breach of contract and warranty are addressed and adjudicated above. They may not recover for the costs to complete construction of the house, because they committed the material breach that excused Oak Ridge from doing the work itself. *See John W. Goodwin, Inc.*, 1999 ME 33, ¶ 19, 725 A.2d at 545. In addition to those claims, they seek relief based on Maine law controlling change orders in home construction contracts, for a violation of the Maine Unfair Trade Practices Act (UTPA), and for common law slander of title.

Title 10 M.R.S.A. § 1488 requires that change orders must be in writing and include particular contents. In two instances, as the Howlands argue, the parties agreed to changes in the contract but failed to satisfy the formal requirements of section 1488. On this basis, the Howlands seeks relief, including a credit for the cost of the work arising from those changes. Contrary to their argument, that is not one of the remedial options created by the statute. Rather, a violation of the statute constitutes a prima facie violation of the UTPA, and it may generate a civil penalty. A prima facie case is one that merely satisfies a party's burden of production. Here, despite Oak Ridge's failure to comply with the statutory requirements arising from a change order, there is no evidence that this failure created confusion or prejudice to any party, and the work within the scope of those changes is not important to the central issues in this case. Thus, despite the provisions of 1490(1), the court declines to conclude that this problem establishes an unfair or deceptive trade practice. Further, although the court "may" impose a civil penalty, the court does not do so.[10]

---

[9] This is a problem distinct from the spacing between the trusses themselves.
[10] The court notes that a civil penalty is not a form of relief that is extended to a private party, such as the Howlands. A civil penalty is paid to the clerk of courts and then goes into the state's general fund.

15

Next, the Howlands contend that Oak Ridge violated the terms of the UTPA. Conduct is regarded as violative of the UTPA when it is unfair or deceptive rather than merely, for example, in breach of a contractual warranty. *See Suminski v. Maine Appliance Warehouse*, 602 A.2d 1173, 1174 (Me. 1992). Here, the court finds that Oak Ridge's actions during the contractual and construction process were unfair and deceptive in three ways. First, the Howlands chose siding that exceeded the contract price by just more than $2,800. This additional price was memorialized in a change order. *See* plaintiff's exhibit 25A. The Howlands paid Oak Ridge this extra amount to supplement the amount ($3,950, *see* plaintiff's exhibit 19 (last page)) that was already included in the contract. Oak Ridge argues that the Howlands did not pay the latter portion of the siding cost, because that was included in Oak Ridge's September disbursement request that the Howlands declined to pay. However, Pawlendzio himself established that the siding vendor, SKR, required payment at the time of delivery. *See* plaintiff's exhibit 23. Oak Ridge in fact obtained the siding. This proves that the Howlands paid Oak Ridge for the siding in full. SKR later was among the businesses that threatened to file a lien against the Howlands' property because it had not been paid. In order to prevent this possibility, the Howlands directed the bank to pay SKR – again – in December. Even by Oak Ridge's account, the Howlands paid a portion of the siding expense twice because the amount paid to SKR in December exceeded the amount that would have been covered by the contract. However, the better evidence reveals that the Howlands paid Oak Ridge in full for the siding but that Oak Ridge did not use that money for its dedicated purpose, requiring the Howlands to pay again. The court finds this to be an unfair and deceptive act.[11]

---

[11] The evidence contains an apparent discrepancy regarding the amount owed to SRK. The original cost for the SRK siding was $6,196, of which the Howland were to pay $2,244 in addition to the cost built into the contract. *See* plaintiff's exhibit 19. The siding cost then was increased to $7,099. This would require the Howlands to pay an extra $2,829 instead of $2,244. They in fact paid the latter amount, *see* plaintiff's exhibit 66, which suggests that the final amount owed to SRK was $7,099. In fact, to avoid a lien, the Howlands paid SRK $6,169 in December. Therefore, it appears that the Howlands paid Oak Ridge the extra amount based on the higher siding charge, although the actual charge was the original, lower amount. This discrepancy is not material to the disposition of the legal issue addressed in the text.

Second, even though the Howlands paid for the windows, Oak Ridge refused to deliver the accompanying accessories to the Howlands. Oak Ridge had those accessories in its possession (demonstrating that the Howlands' payments for the windows themselves included payment for the accessories) and in fact promised to give them to the Howlands when they wanted the property in September. Nonetheless, Oak Ridge retained possession of them for the express purpose, as Pawlendzio acknowledged during his testimony, of inducing the Howlands to pay Oak Ridge on its claim against them. However, because the Howlands had already paid for those items, Oak Ridge's ongoing retention of them was wrongful and unfair. And for the reasons noted above, when Oak Ridge offered to turn some of those accessories over to the Howlands, conditioned upon payment of money, the Howlands refusal was not unreasonable and did not bar their claim here.

Finally, Oak Ridge acted unfairly toward the Howlands when it filed a lien against their property in direct contravention to its express written promise, *see* plaintiff's exhibit 7, to keep the property free of such encumbrances. That conduct rises to the level of the common law tort of slander of title: when the lien process is misused and prompted by an improper motive, it is actionable even though it may be part of a legal proceeding. *See Advanced Construction Corp. v. Pilecki*, 2006 ME 84, ¶ 23, 901 A.2d 189, 197. Here, Oak Ridge filed a lien that was based in part on a claim that the Howlands owed it for the costs of siding that had already been covered, at least in part, by payments made by the homeowners.[12] At the very least, that conduct can only be seen as unfair.

"In order to recover damages for a violation of the UTPA the homeowner must show a loss of money or property that results from the violation. 5 M.R.S.A. § 213." *See William Mushero, Inc. v, Hull*, 667 A.2d 853, 855 (Me. 1995). Here, the Howlands have established that they have suffered financial loss due to Oak Ridge's unfair and deceptive acts. Because Oak Ridge did not pay SRK for the siding after receiving money from the

---

[12] As is discussed below, even though the Howlands have established that Oak Ridge engaged in conduct that makes up the tort of slander of title, the Howlands have not proven that they sustained actual damages resulting from Oak Ridge's conduct. Thus, despite proving their liability claim, the tort action fails for want of proven damages. The court nonetheless concludes that the actionable conduct is unfair within the meaning of the UTPA.

Howlands earmarked for that purpose, the Howlands were required to pay SRK directly. Next, the Howlands paid Oak Ridge for the window accessories but did not receive them. This constitutes a loss of money or property. These forms of losses are addressed as part of the contract claims. However, these losses also entitle the Howlands to an award of attorneys fees for legal services rendered for these limited aspects of their claim. 5 M.R.S.A. § 213.[13] Counsel may file an affidavit of attorney's fees as provided by M.R.Civ.P. 54. Counsel for Oak Ridge may file a written response to any such application within 14 days of the date the affidavit is filed.

Finally, the Howlands claim that Oak Ridge is liable for slander of title. As is discussed above, the Howlands have established that Oak Ridge engaged in this tortious conduct when it filed a lien based in part on a claim for payment that, as Oak Ridge knew, the Howland had already satisfied. *See Advanced Construction Corp.*, 2006 ME 84, ¶ 23, 901 A.2d at 197. However, to obtain relief for actionable conduct, an aggrieved party must also prove actual or special damages. *Colquhoun v. Webber*, 684 A.2d 405, 409 (Me. 1996). Here, the Howlands contend that they were prejudiced by the encumbrance to title created by the lien when their construction loan was due to convert into a permanent secured loan. They obtained their construction money from Bangor Savings Bank but ended up obtaining a permanent loan from Merrill Merchants Bank. At Merrill Merchants, they paid closing costs. If they had remained with Bangor Savings Bank, they would have paid a flat fee, amounting to less than the Merrill Merchant's closing costs, to effect the conversion. Julie Howland testified that the reason they turned to Merrill Merchants was because they could borrow there at a lower interest rate. Thus, the closing costs imposed by Merrill Merchants were not the result of a title problem but rather because of the Howlands' choice of lenders. Further, to the extent that Howland's testimony might be seen to suggest that the transaction was delayed due to the lien and that interest rates rose in the meantime, there is no evidence to support, much less quantify, any such claimed loss. And the court does not view attorneys fees as a form of actual or special damages in light of the prevailing rule that litigants are responsible for

---

[13] Oak Ridge has not raised any issue based on the statutory requirement that a UTPA claimant provide written notice of the claim in advance of asserting such a claim in court. *See* 5 M.R.S.A. § 213(1-A).

18

such expenses they incur during legal proceedings involving common law claims such as one for slander of title.

Therefore, because of the absence of proof of actual or special damages, the Howlands cannot recover on a claim for abuse of process.

The entry shall be:

For the foregoing reasons, on the amended complaint, judgment is entered for the plaintiff on counts 1, 4 and 5. On counts 3 and 5, judgment is entered for the defendants. On the counterclaim, judgment is entered for the defendants (counterclaim plaintiffs) on counts 1, 4 and 5. Judgment is entered for the plaintiff (counterclaim defendant) on counts 2 and 3.

Net damages are awarded to the plaintiff and against the defendants jointly and severally in the amount of $190, plus pre-judgment interest at the annual rate of 8% and post-judgment interest at the annual rate of 10.36%.

The parties may file submissions on attorney's fees as provided in this order.

Except for any costs of court that may be included in any award of attorneys fees, no party is awarded their costs of court because none of them may be viewed as a prevailing party within the meaning of 14 M.R.S.A. § 1501.

Dated: October 6, 2006

Justice, Maine Superior Court
sitting in Maine District Court
Jeffrey L. Hjelm

19

OAK RIDGE BUILDERS, INC. - PLAINTIFF
PO BOX 3566
BREWER ME 04412
Attorney for: OAK RIDGE BUILDERS, INC.
JON HADDOW  - RETAINED 01/14/2003
FARRELL ROSENBLATT & RUSSELL
PO BOX 738
BANGOR ME 04401-0738

vs
TODD M HOWLAND  - DEFENDANT
57 CARTER WOODS,
BRADLEY ME 04411
Attorney for: TODD M HOWLAND
EDWARD W GOULD  - RETAINED
GROSS MINSKY MOGAL PA
23 WATER ST SUITE 400
PO BOX 917
BANGOR ME 04402

JULIE M HOWLAND  - DEFENDANT
57 CARTER WOODS,
BRADLEY ME 04411
Attorney for: JULIE M HOWLAND
EDWARD W GOULD  - RETAINED
GROSS MINSKY MOGAL PA
23 WATER ST SUITE 400
PO BOX 917
BANGOR ME 04402

**DOCKET RECORD**


Filing Document: COMPLAINT                    Minor Case Type: CONTRACT
Filing Date: 01/14/2003

## Docket Events:

01/14/2003 FILING DOCUMENT - COMPLAINT FILED ON 01/14/2003

01/20/2003 Party(s):  OAK RIDGE BUILDERS, INC.
           ATTORNEY - RETAINED ENTERED ON 01/14/2003
           Plaintiff's Attorney: JON HADDOW

04/08/2003 Party(s):  OAK RIDGE BUILDERS, INC.
           SUPPLEMENTAL FILING - AMENDED COMPLAINT FILED ON 04/07/2003
           Plaintiff's Attorney:  JON HADDOW

04/23/2003 Party(s):  OAK RIDGE BUILDERS, INC.
           MOTION - MOTION FOR ENLARGEMENT OF TIME FILED ON 04/17/2003
           Plaintiff's Attorney:  JON HADDOW
           FOR FILING SERVICE.

04/24/2003 Party(s):  OAK RIDGE BUILDERS, INC.
           MOTION - MOTION FOR ENLARGEMENT OF TIME GRANTED ON 04/23/2003
           RONALD D RUSSELL , JUDGE
           PLAINTIFF TO FILE RETURN OF SERVICE ON OR BEFORE MAY 14,2003          4-24-03 COPY
           SENT TO ATTY HADDOW